## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____
                                       )

|  |  |  |
|---|---|---|
| T.S. KAO, INC. d/b/a LUCKY 7 CHINESE FOOD, on behalf of itself and all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | FILE NO. _____ |
| | ) | |
| NORTH AMERICAN BANCARD, LLC and GLOBAL PAYMENTS DIRECT, INC., | ) ) ) | |
| | ) | CLASS ACTION |
| Defendants. | ) | |

_____)

## CLASS ACTION COMPLAINT

Plaintiff T.S. Kao, Inc. d/b/a Lucky 7 Chinese Food, by and through its undersigned counsel, on behalf of itself and all persons and entities similarly situated (the "Class," as defined below), submits this Class Action Complaint against Defendants North American Bancard, LLC ("NAB") and Global Payments Direct, Inc. ("Global") (together, "Defendants," unless otherwise identified) and alleges the following based on personal knowledge as to allegations regarding itself and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking declaratory relief, monetary damages, and restitution from Defendants, arising from their assessment and collection of unauthorized and excessive payment processing fees and charges from Plaintiff and the other Class members.

2.      In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards.  In order to accept these payment methods, merchants must use payment processing systems.

3.      Merchants rely on the companies that provide payment processing services to do so at a fair, agreed upon price.  Indeed, fees for card processing services are likely the third highest expense most merchants incur, following labor and product costs.

4.      The card processing system can be a difficult one to understand, with many involved parties.  For instance, in addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a)      The Card Issuer – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one its cards for a transaction.

These companies charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). This fee varies based on the type of card used. For example, the card issuing companies will charge a higher fee for transactions involving a rewards credit card than a card with no rewards program. Although it is paid to the card issuer, the amount of this fee is set by the card networks (see below). These fees are generally known as "interchange rates."

(b)     The Card Network – the card networks (*i.e.*, Visa, MasterCard, Discover, and American Express) also charge fees on a per-transaction basis. By way of example, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access Brand Usage") fee. These fees are generally known as "access fees." The card networks also charge various additional fees, including fees calculated as a specific percentage of transaction volumes (e.g., "assessments" of 0.11% on all Visa transactions before July 2016, and 0.13% since July 2016).

(c)     The Payment Processor – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is debited and the merchant's account is credited. Defendant Global is a

payment processor.

(d)   <u>The Member Bank</u> – only banks, such as Wells Fargo and HSBC, may be members of card networks.   These member banks "sponsor" payment processors so they may process transactions through the card networks.

(e)   <u>The Merchant Acquirer</u> – this is the company that markets the payment processor's services to merchants or aggregates accounts of Independent Sales Organizations ("ISOs") or Merchant Service Providers ("MSPs") who deal directly with merchants.   Merchant acquirers and ISOs/MSPs essentially act as a "middle man" between merchants and payment processors.   They enroll merchants in payment processing services, ensure that the services are working properly, and provide customer support to the merchant.   Defendant NAB is a merchant acquirer.

5.   Ordinarily, a merchant that wants to accept credit and debit cards as a form of payment contracts with a payment processor and/or merchant acquirer to obtain such services.   This contract sets forth the fees that the merchant will be charged, which commonly consist of two parts:

(a)   <u>"Pass Through" Costs</u> – these charges consist of the interchange rates charged by card issuers and the access fees and assessments imposed by card networks.   These are set costs incurred by the member bank that apply universally at any given time, regardless of the type of the transaction or the identity of the

merchant. These costs are set, unavoidable, and are "passed through" to the merchant on their monthly billing statement.

(b) <u>Payment Processing Fees</u> – these are the fees which the merchant is charged by the payment processor and/or merchant acquirer for payment processing services. Unlike interchange rates, access fees, and assessments, these fees are negotiated on the front end of the parties' relationship. They too are reflected on the merchant's monthly billing statement.

6. The number of involved parties and moving pieces can make it difficult for small- and medium-sized merchants to understand whether their card processing companies are only charging them fees allowed by their contracts.

7. Unfortunately, some companies that implement and service card processing systems take advantage of this confusion. They induce merchants to execute standardized contracts for their services with the promise of straightforward, transparent pricing, but then implement mark-ups and junk fees.

8. These improper fees are assessed for the sole purpose of raising additional revenue at the merchants' expense.

9. For several years, Defendants have perpetrated this scheme. This case challenges the amount and nature of the payment processing fees that have been imposed. Such fees violate the express terms of the parties' form "Merchant

Service Agreement," as well as the covenant of good faith and fair dealing. Furthermore, several pertinent provisions of the adhesive Agreement are unconscionable or otherwise unenforceable. Additionally, the fees charged are unjust and it would be inequitable for Defendants to retain them. Finally, Defendants misrepresented and omitted key facts concerning their billing practices both in the Application and in monthly statements.

## **PARTIES**

10. Plaintiff T.S. Kao, Inc. d/b/a Lucky 7 Chinese Restaurant ("Lucky 7") is a Michigan corporation. Lucky 7 is a merchant that owns and operates a Chinese food restaurant in Ypsilanti, Michigan. It receives payment processing services through Defendants.

11. Defendant NAB is a Delaware limited liability company. NAB is one of the world's largest merchant acquirers. Indeed, NAB provides merchant services to more than 250,000 merchants nationwide.

12. Defendant Global is a New York corporation. Global is a payment processor that, according to its websites, services 1.5 million merchants in 29 countries and processes $6.5 billion in transactions and generates $2.6 billion in revenue per year.

## JURISDICTION AND VENUE

13.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 Class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.  As a limited liability company, NAB is considered an "unincorporated association" for purposes of jurisdiction under the Class Action Fairness Act.  28 U.S.C. § 1332(d)(10).

14.     This Court has personal jurisdiction over Defendants because they both conduct substantial business within the State of Georgia, such that they have significant, continuous, and pervasive contacts with this State.  Jurisdiction also exists because the Merchant Service Agreement (Exhibit A) specifies this Court as the proper forum for any litigation arising out of or relating to that document or the relationships it creates.

15.     Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendants both conduct business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district.

## COMMON FACTUAL ALLEGATIONS

**I.**     **Merchants Contract for Transparent, Low Cost Payment Processing Services.**

16.     NAB is headquartered in Troy, Michigan.  According to its website, NAB "help[s] those striving for the American dream achieve it by providing them access to industry-leading merchant services."  NAB purports to offer "some of the lowest rates for payment processing you can find today."

17.     NAB specializes in enrolling merchants in payment processing services.  Thereafter, NAB is charged with ensuring that the services are working properly, providing customer support to merchants, and handling monthly billing and collections.

18.     NAB does not, however, process payments itself.  Rather, such services are provided through the metro-Atlanta-headquartered Global, a back-end payment processing company.

19.     NAB has partnered with Global to provide payment processing services to merchants for well over a decade.

20.     Whenever NAB solicits business from a merchant, it provides the merchant with the form Merchant Service Agreement ("Agreement" or "MSA"). The MSA consists of (a) the Merchant Application; and (b) the Terms and Conditions of Merchant Service Agreement ("Terms").

21.     NAB is not specifically identified as a party to the Agreement.  *See* MSA, p. 2 (identifying merchant, Global, and the member bank as the parties).

22.     Nevertheless, NAB is clearly a party to the Agreement.  For instance, NAB's logo is prominently featured on the Merchant Application.  *See* MSA, p. 1. The Application also directs merchants to address "[a]ll questions regarding merchant processing" to NAB.  *Id.*   There is also a signature block on the Application for "Application Accepted by ISO."  *Id.* at 11.  Because NAB is the ISO in Plaintiff's transaction, this signature block is clearly intended for NAB.

23.     Moreover, the Terms do impose obligations on NAB.  *See* MSA, p. 11 (authorizing NAB to "initiate automated deposit or debit (ACH) entries to [Plaintiff's] bank account" and to collect merchant fees, "subject to and only as pursuant to [NAB's] separate written agreement with Global Direct").

24.     The Merchant Application identifies the fees and charges to which the merchant will be subject *if* it decides to enroll in Defendants' services.  The Application explicitly provides that merchants will be subject to two general types of charges.

25.     The first general type of charge is "cost-plus" pricing.  Under this method of pricing, the interchange rates, access fees, and assessments set by the card networks are passed through to the merchant *at cost* and the merchant is

separately charged an additional amount representing the payment processing fee (*i.e.*, the interchange rates, access fees, and assessments together comprise the "cost" in "cost-plus" pricing and the "plus" is Defendants' fee).

26.    By way of example, attached as Exhibit A is a copy of Lucky 7's MSA, which on pages 1, 10, and 11 contains the Merchant Application.  This Application states that for each transaction swipe, the merchant will be charged "Interchange Passthrough +50 Basis Points" and a per "Transaction Fee:  $.10." *See* MSA, p. 10 (also stating, "Actual Interchange Passthrough and Assessments plus 50 BPS").

27.    In addition to such cost-plus pricing, the Application also specifically identifies the second type of charges – "Other Fees" – to which the merchant will be subject "if applicable."  *Id.*  In the case of Lucky 7, for example, such "Other Fees" include a "Wireless Network Access (Monthly)" of $14.95 and a "Monthly Basic Service Fee" of $9.95.  *Id.* (indicating these fees are applicable to Lucky 7 by denoting a "*" next to them).

28.    The Application thus informs the merchant – in clear, unambiguous terms – what it will be charged if it agrees to enroll in Defendants' services and how such charges will be calculated.

29.    This transparency is very important because the Agreement extends for a set period of time, typically three years.  If a merchant desires to end its relationship with Defendants prior to the expiration of this term, it often must pay an early termination fee of at least $295.00.

30.    Those merchants that are interested in doing business for the specified fees identified in the Application sign it.  The information contained in the Application is part and parcel of the deal.

## II.    Defendants Systematically Overcharge Their Merchants.

31.    Over the course of its relationship with merchants, NAB has imposed payment processing fees that do not comport with those set forth in the Application.  These unauthorized and inflated fees are imposed for no other reason than to improve NAB's bottom line (and that of its partner, Global).

32.    Upon information and belief, NAB chooses what fees to impose on merchants that are above and beyond those set forth in the merchant contracts. NAB then provides specifications to Global as to the nature and amount of future merchant overcharges (e.g., what new junk fees to impose and when, what pass-through access fees and assessments to increase, when to increase them, etc.).

33.    Despite being a party to the Merchant Agreements and knowing that such fees are unauthorized, Global nevertheless ensures that merchants are charged

these amounts.  For instance, Global prepares the monthly statements that impose such fees.

34.   It is currently unknown which Defendant actually distributes the monthly statements to merchants and/or debits the fees from merchant accounts. For example, NAB is identified at the top of each statement but the form and format of the statement appears to be generated by Global (as shown by the fact that it is very similar to statements used by other merchant acquirers that have partnered with Global).  Regardless, it is clear that they both are integral cogs in the scheme and share in its proceeds.  Discovery will reveal the precise nature of each Defendant's back office role.

35.   The various unauthorized and inflated fees imposed by Defendants are described in more detail below.

36.   First, Defendants charged several types of fees that are not set forth in Lucky 7's Application.  Among the fees that were charged to Lucky 7 that are mentioned *nowhere* in the Application are: (a) an annual PCI service fee ($79.00 to $99.00/year); (b) a monthly PCI non-compliance fee ($6.95 to $29.95/month); (c) an annual regulatory fee ($99.00); (d) a PCI scan fee ($64.95); and (e) an EMV readiness fee ($29.99).

37.    Second, on information and belief, Defendants routinely charge other fees that are mentioned *nowhere* in Class member Applications, including: (a) fixed acquirer network fees ($4.00); (b) "www.mypci.com" fees ($24.95 to $99.00); and (c) annual fees (up to $192.00 or more).

38.    Third, Defendants charged Lucky 7 several types of fees that, although set forth in its Application, were not fees that were denoted as being applicable to Lucky 7, including: (a) a monthly minimum discount fee ($25.00); (b) batch header fees ($.035/transaction); and (c) a chargeback fee ($25.00).

39.    Fourth, on information and belief, Defendants routinely charge other fees that, although set forth in the Application, are not denoted as being applicable to Class members, including a monthly basic service fee ($5.00 to $10.00).

40.    Fifth, Defendants charge fees at times when the Application specifically states they would not be charged.  For example, they charged Lucky 7 an $11.95 monthly "Biz Perks" fee before the Application said such fee would be charged.  On information and belief, Lucky 7 alleges that Defendants routinely charge a "Biz Perks" (or "www.mybizperks.com") fee of $11.95 that is contrary to the contract and without merchant authorization.

41.    Sixth, Defendants systematically overcharged merchants for assessments and access fees imposed by the Card Networks (Visa, MasterCard,

13

etc.).  Although Defendants represented in the Application that they would charge Lucky 7 "actual interchange passthrough and assessments plus 50 BPS," in fact, they illegally and impermissibly inflated those assessments.  The 50 basis points which Lucky 7 agreed to pay in addition to actual interchange and assessments are reflected in the "discount rate" indicated on Lucky 7's monthly statements.  But Defendants systematically increased the Visa and MasterCard assessments – which are listed separately on the monthly statements – by five or more additional basis points per transaction.  This tactic artificially increased the amount Lucky 7 was required to pay for assessments that were required to be "passed through," and thus artificially inflated Defendants' revenues at Lucky 7's expense.

42.   For example, as reflected on its April 2013 through June 2013 statements, Defendants passed through the actual assessments imposed by the card networks, as the Agreement required.  However, in July 2013, they increased these assessments by five basis points.  Such overcharges continued monthly until April 2014 when assessments increased by another two basis points (for a total of seven basis points).  Such overcharges continued into 2016.

43.   Moreover, Lucky 7 expressly agreed to pay $0.0198 per transaction for the MasterCard access fee (the NABU fee, defined above) and $0.0218 per transaction for the Visa access fee (the APF fee, defined above).  *See* MSA, p. 10.

But Defendants charged Lucky 7 more than $0.0198 for MasterCard transactions and $0.0218 for Visa transactions.

44.    For example, as reflected on its April 2013 through June 2013 statements, Defendants charged the agreed rates of $0.0198 per MasterCard transaction and $0.0218 per Visa transaction, but, beginning in July 2013, they began charging $0.0368 per MasterCard transaction and $0.0378 per Visa transaction.  This practice continued until March 2014.

45.    For each month from April 2014 to April 2016, Defendants charged $0.0468 per MasterCard transaction and $0.0478 per Visa transaction, more than *doubling* the permitted fee on a per-transaction basis.

46.    By inflating the pass-through assessments and card association access fees in this way, Defendants pilfered thousands of dollars from Lucky 7 and untold amounts from other Class members.

47.    Merchants that have been overcharged and billed for unauthorized junk fees and inflated assessments and access fees in contravention of the Merchant Service Agreement are disincentivized from terminating their relationship with Defendants, because they are on the hook for an early termination fee if the term has not yet expired.  Thus, merchants that are subject to the

termination fee are essentially put to a Hobson's Choice – pay the early termination fee (often in excess of $295.00) or accept the overbilling.

## III.   Defendants Endeavor to Legitimize Their Overbilling Via Adhesive Terms.

48.     To further harm merchants, Defendants have buried oppressive provisions in the adhesive Terms.

49.     The Terms are a boilerplate form document that is not negotiable and is presented to the merchant on an adhesive, take-it-or-leave-it basis.  *See* MSA, pp. 2-9.  The Terms consist of small font text occupying more than 30 densely-worded paragraphs over nine pages.

50.     The Terms represent a unilateral effort by Defendants to:   (a) backtrack from the agreements as to fees that were reached in the Application; and (b) immunize themselves from liability for their misconduct.

51.     The Terms include clauses purporting to:

(a)     give Defendants broad discretion to change the amounts of agreed-upon fees or impose whatever new fees they desire (MSA, pp. 2-3, 5);

(b)     limit Defendants' liability to one month's worth of overcharges (*id.* at 4);

(c)     limit the statute of limitation for claims related to "billing errors" to 90 days (*id.*);

(d)    require merchants to pay attorneys fees in any legal action (regardless of whether Defendants are deemed the prevailing parties) (*id.* at 6);

(e)    prohibit merchants from pursuing their claims in a class action (*id.*); and

(f)    prohibit merchants from enforcing their right to a jury trial (*id.*).

52.    These provisions violate public policy, lack mutuality, are unconscionable, and are otherwise void and unenforceable.

## IV.    Defendants' Practices Have Harmed Plaintiff and the Other Class Members.

53.    The wrongful overbilling policies and practices described above harmed Plaintiff and the other Class members.

54.    Lucky 7 was a merchant customer of Defendants beginning in early 2013.  Defendants victimized and damaged Lucky 7 through the overbilling practices described herein.  Specifically, NAB charged Lucky 7 junk fees that were not identified in the Merchant Application (or identified as being applicable to Plaintiff) and, as described in detail above, inflated access fees and assessments above and beyond the "pass through" charges it agreed to pay.

55.    As a consequence of Defendants' overbilling policies and practices, Plaintiff and the other Class members have been wrongfully forced to pay unauthorized fees and charges.  Defendants have improperly deprived Plaintiff and

the other Class members of significant funds, causing them to sustain damages. Because Defendants' practices of imposing unauthorized junk fees and inflating assessments and access fees were applied to the other Class members' accounts (of which there may be over 250,000) in an automated fashion, Defendants have pilfered hundreds of millions of dollars from their clients.

56.    As a consequence of Defendants' improper charges and fees, Defendants have wrongfully deprived Plaintiff and the other Class members of funds to which Defendants have no legitimate claim.

## CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action individually and on behalf of the following class of similarly situated merchants pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure:

> All NAB customers in the United States who paid a fee or charge that was not authorized by the Merchant Service Agreement.

58.    Plaintiff reserves the right to modify or amend the definition of the proposed Class, or other proposed classes or subclasses, before the Court determines whether certification is appropriate and as the Court may otherwise allow.

59.    Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, the government, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

60.    The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants remedy the conduct complained of herein.   Based on Georgia's statute of limitations for breach of contract actions, the class period is likely to be six years if the contract is held to be enforceable.

61.    The proposed Class meets all requirements for class certification.  The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members and the identity of those persons and entities is within the knowledge of Defendants and can be ascertained by resort to Defendants' records.

62.    The claims of the representative Plaintiff are typical of the claims of the other Class members.  Plaintiff, like all other Class members, was overcharged by Defendants as a result of their improper practices, including the imposition of

inflated assessments and access fees and unauthorized junk fees. The representative Plaintiff, like all Class members, has been damaged by Defendants' misconduct. Furthermore, the factual basis of Defendants' misconduct is common to all Class members, and represents a common thread of conduct resulting in injury to all Class members.

63.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

64.    Among the questions of law and fact common to the Class are whether Defendants:

(a)    Imposed unauthorized junk fees;

(b)    Inflated assessments and access fees;

(c)    Breached contractual provisions and/or the covenant of good faith and fair dealing through their billing practices;

(d)    Required merchants to enter and enforced standardized account agreements which included unconscionable or otherwise unenforceable provisions;

(e)    Were unjustly enriched through their billing practices; and

(f)     Acted and continue to act deceptively, misleadingly, unfairly, unlawfully, and/or fraudulently by imposing unauthorized junk fees and inflating assessments and access fees.

65.     Other questions of law and fact common to the Class include:

(a)     The proper method or methods by which to measure damages; and

(b)     The declaratory and/or injunctive relief to which the Class is entitled.

66.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

67.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, most Class members could not afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will be unable to obtain redress for their losses and Defendants' misconduct will have occurred without remedy.

68.    Even if Class members themselves could afford such individual litigation, the court system could not.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

69.    The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible standards for Defendants.

70.    Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.  Specifically, Defendants continue to knowingly overbill the Class and to enforce unconscionable or otherwise unenforceable contractual provisions in order to block Plaintiff and the other Class members from seeking legal relief.  Class-wide declaratory and/or injunctive relief is appropriate to put an end to these illicit practices.

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

71.     Plaintiff repeats paragraphs 1 through 70 above.

72.     Plaintiff, on behalf of itself and the other Class members, asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing.

73.     Plaintiff and Defendants have contracted for payment processing services.  As described above, Defendants' actions have violated the specific terms of the form Merchant Service Agreements with their customers.  Defendants are liable for the losses of Plaintiff and the other Class members that have resulted from Defendants' breaches of the parties' contractual agreements.

74.     Georgia law imposes upon each party to a contract the duty of good faith and fair dealing.[1]  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing

---

[1] The Merchant Service Agreement provides that Georgia law applies.  *See* MSA, p. 6.

the power to specify terms constitute examples of bad faith in the performance of contracts.

75.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, and abuse of a power to specify terms.

76.     Defendants have breached the covenant of good faith and fair dealing with Plaintiff and the other Class members through their practices as alleged herein.

77.     Plaintiff and the other Class members have performed all, or substantially all, of the obligations imposed on them under the Merchant Service Agreement, or those obligations are waived.

78.     Plaintiff and the other Class members sustained damages as a result of Defendants' breaches of the Agreement, as well as the further breaches of the Agreement as modified by the covenant of good faith and fair dealing.

## COUNT TWO
## Unconscionability

79.     Plaintiff repeats paragraphs 1 through 70 above.

80.     Defendants have attempted to immunize themselves from legal claims by imposing adhesive, unfair, and draconian terms in their Merchant Service Agreement making it extremely costly and practically impossible to obtain relief from their improper overbilling practices, as alleged in this Complaint.

81.     Such terms include those purporting to:

(a)     give Defendants broad discretion to change the amounts of agreed-upon fees or impose whatever new fees they desire (MSA, pp. 2-3, 5);

(b)     limit Defendants' liability to one month's worth of overcharges (*id.* at 4);

(c)     limit the statute of limitation for claims related to "billing errors" to 90 days (*id.*);

(d)     require merchants to pay attorneys fees in any legal action (regardless of whether Defendants are deemed the prevailing parties) (*id.* at 6);

(e)     prohibit merchants from pursuing their claims in a class action (*id.*); and

(f)     prohibit merchants from enforcing their right to a jury trial (*id.*).

82.     The Merchant Service Agreement, as a whole or in part, is substantively and procedurally unconscionable.

83.     Indeed, the Agreement is a contract of adhesion in that it is a standardized form, imposed and drafted by Defendants, which are the parties of vastly superior bargaining strength, that only allowed Plaintiff and the Class members the opportunity to adhere to them or reject them entirely.

84.     The Agreement is deceptive, unfair, illusory, and misleading to any extent it allowed Defendants to perpetrate the grossly improper acts described herein.

85.     Considering the great business acumen and experience of Defendants in relation to Plaintiff and the Class members, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, the Agreement is unconscionable and, therefore, unenforceable as a matter of law.

86.     Plaintiff and the Class members have sustained damages as a result of Defendants' unconscionable Agreement as alleged herein.

87.    Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## COUNT THREE
## Unjust Enrichment

88.    Plaintiff repeats paragraphs 1 through 70 above.

89.    Plaintiff, on behalf of itself and the other Class members, asserts a common law claim for unjust enrichment.  This claim is brought in the alternative to Count One and is contingent on the Merchant Service Agreement either being deemed unenforceable or inapplicable to Plaintiff's relationship with either or both Defendants (for instance, NAB is not identified as a party to the Agreement).  In either scenario, unjust enrichment will dictate that Defendants must disgorge all improper fees.

90.    By means of Defendants' wrongful conduct alleged herein, Defendants knowingly engaged in billing practices against Plaintiff and the other Class members that were unfair, unconscionable, and oppressive.

91.    Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and the other Class members.  In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and the other Class members.

92.     As a result of Defendants' wrongful conduct as alleged herein, they have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the other Class members.

93.     Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

94.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits they have received, and are still receiving, without justification, from the imposition of illicit junk fees on Plaintiff and the other Class members in an unfair, unconscionable, and oppressive manner.   Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

95.     The financial benefits derived by Defendants rightfully belong to Plaintiff and the other Class members.   Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and the other Class members all wrongful or inequitable proceeds.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Defendants traceable to Plaintiff and the other Class members.

## COUNT FOUR
## Fraud

96.     Plaintiff repeats paragraphs 1 through 70 above.

97.     Plaintiff, on behalf of itself and the other Class members, asserts a common law claim for fraud.  This count is premised on Defendants' fraudulent misrepresentations in the Application as well as in the monthly statements transmitted by Defendants to Plaintiff and other Class members, and on Defendants' fraudulent omissions in the Application as well as in the monthly statements transmitted by Defendants to Plaintiff and other Class members.

98.     As alleged above, Defendants have affirmatively misrepresented their billing practices in the Application.  Paragraphs 24 through 28 above describe in detail the misstatements as to what Plaintiff would be charged.

99.     In reality, Defendants never intended to honor these representations. Defendants charged junk fees not mentioned and inflated assessments and access fees beyond the amounts identified in the Application.

100.    Moreover, the Application contains fraudulent omissions because the fact that Defendants would inflate or mark up both the assessments and the access fees was not disclosed therein.  That fact was material to Plaintiff and to all Class members because the entire purpose of any merchant's acquisition of card processing services from Defendants on an interchange-plus basis is to obtain

transparency into the fee structure for each transaction cost, and to eliminate unnecessary transaction costs.

101.   Defendants' monthly invoices also contain fraudulent misrepresentations and fraudulent omissions.   As alleged above, Defendants inaccurately described certain charges as card association assessments or access fees, when in fact such charges include inflation or mark-up arbitrarily added by Defendants.   Moreover, Defendants inaccurately describe certain charges as fees required for various purposes (including PCI fees, EMV fees, acquirer network fees, annual fees, and basic service fees), when in fact such charges are imposed solely to benefit Defendants.   All such descriptions on monthly invoices are false representations.

102.   Similarly, each monthly invoice fails to disclose that the charges labeled as card association assessments and access fees in fact include inflation or mark-up arbitrarily imposed by Defendants.   Moreover, each monthly invoice fails to disclose that the charges labeled as various standalone fees (including PCI fees, EMV fees, acquirer network fees, annual fees, and basic service fees) are in fact charged solely to benefit Defendants.   Such omissions are material to Plaintiff and all Class members because the entire purpose of any merchant's acquisition of card processing services from Defendants on an interchange-plus basis is to obtain

transparency into the fee structure for each transaction cost, and to eliminate unnecessary transaction costs.

103.   Plaintiff and all Class members relied upon Defendants to disclose the truth about its charges, and relied upon the representations in the Application and the monthly invoices in paying Defendants what Defendants claimed was due.

104.   Plaintiff and all Class members have been damaged as a result of Defendants' fraudulent misrepresentations and omissions as alleged herein.

105.   Accordingly, Plaintiff seeks monetary, declaratory, and injunctive relief, including attorneys' fees and costs of suit.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the other Class members, respectfully requests that this Court enter judgment against Defendants as follows:

1.   Declaring the several challenged provisions of the Merchant Service Agreement to be unenforceable and enjoining their enforcement;

2.   Declaring Defendants' fee assessment policies and practices to be violative of the Merchant Service Agreement, wrongful, and unconscionable;

3.   Awarding restitution of all illicit fees at issue paid to Defendants by Plaintiff and the other Class members as a result of the improper practices alleged herein in an amount to be determined at trial;

4.      Compelling disgorgement of the ill-gotten gains derived by Defendants from their misconduct;

5.      Awarding actual damages in an amount according to proof;

6.      Awarding punitive and exemplary damages;

7.      Awarding pre- and post-judgment interest at the maximum rate permitted by applicable law;

8.      Reimbursing all costs and disbursements accrued by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

9.      Granting a trial by jury; and

10.     Awarding such other relief as this Court deems just and proper.

DATED this 10th day of November, 2016.

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, LLC

*/s/ E. Adam Webb*
E. Adam Webb
  Georgia State Bar No. 743910
Matthew C. Klase
  Georgia State Bar No. 141903

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 217-9950 (fax)
Adam@WebbLLC.com
Matt@WebbLLC.com

*Attorneys for Plaintiff*