## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

|  |  |  |
|---|---|---|
| T.S. KAO, INC. d/b/a LUCKY 7 CHINESE FOOD, THE DINNER BELL CAFÉ, INC., BILL'S PIZZA PALM SPRINGS, and BILL'S GRILL 1 LLC, individually and on behalf and all others similarly situated, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil Action |
| v. | ) ) | No. 1:16-cv-04219-SCJ |
| NORTH AMERICAN BANCARD, LLC and GLOBAL PAYMENTS DIRECT, INC., | ) ) ) | Honorable Steve C. Jones |
|  | ) | CLASS ACTION |
| Defendants. | ) |  |

_____)

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs T.S. Kao, Inc. d/b/a Lucky 7 Chinese Food ("Lucky 7"), the Dinner Bell Café, Inc. ("Dinner Bell"), Bill's Pizza Palm Springs ("Bill's Pizza"), and Bill's Grill 1 LLC ("Bill's Grill") (together, "Plaintiffs"), by and through their undersigned counsel, individually and on behalf of all persons and entities similarly situated (the "Classes," as defined below), submit their Consolidated Amended Class Action Complaint against Defendants North American Bancard, LLC ("NAB") and Global Payments Direct, Inc. ("Global") (together, "Defendants," unless otherwise identified) and allege the following based on

personal knowledge as to allegations regarding themselves and on information and belief as to other allegations.

## I.  NATURE OF THE ACTION

1.     Plaintiffs, individually and on behalf of all others similarly situated, bring this class action against NAB, a nationally-operating merchant services company, and Global, a multinational payment card processor, for their use of unfair, unlawful, and fraudulent business practices in violation of Georgia state law.

2.     Plaintiffs are merchants who formerly obtained payment card processing services from Defendants.

3.     In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards.  In order to accept these payment methods, merchants must use payment processing systems.

4.     Merchants rely on the companies that provide payment processing services to do so at fair, agreed upon prices.  Indeed, fees for payment card processing services are typically the third highest expense most merchants incur, following labor and product costs.

5.     The payment card processing system can be difficult to understand in light of the many parties involved in any given transaction.  For instance, in

addition to the merchant who receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

(a)    The Card Issuer – the company that issued the credit or debit card to the customer, which is typically a bank (such as Chase or Bank of America), and which charges a fee whenever a customer uses one its cards for a transaction.  Card issuers charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction).  This fee varies based on the type of card used.  For example, the card issuer may charge a higher fee for transactions involving a rewards credit card than a card with no rewards program.  Although it is paid to the card issuer, the amount of this fee is established by the card network, such as Visa or MasterCard (see below), and is therefore considered a card network "assessment."   These assessments are generally known as "interchange fees," and they are collected by the payment card processor from the merchant that submitted the transaction.

(b)    The Card Network – the card networks (i.e., Visa, MasterCard, Discover, and American Express) also charge fees on a per-transaction basis. Among other things, Visa assesses a fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a fee known as the "NABU" ("Network Access and Brand Usage") fee.  These fees are generally known as "access fees"

3

and, like interchange fees, belong to the category of fees known generally as card network "assessments," since they are established by the card networks. The card networks also charge other assessments calculated as a specific percentage of total transaction volumes, *e.g.*, 0.11% (or 11 basis points) on all VISA credit transactions before July 2016, and 0.13% (or 13 basis points) since July 2016. These other assessments are established by the card networks, and they are collected by the payment card processor from the merchant that submitted the transaction.

(c)   The Payment Processor – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or service with a credit or debit card, the customer's account is properly debited and the fees and charges are properly routed to the various interested parties. The payment processor is also typically responsible for preparing monthly invoices for each merchant, although such invoices may be branded and/or distributed by the Merchant Acquirer (see below). Defendant Global is a payment processor.

(d)   The Member Bank – only banks, such as Wells Fargo and HSBC, may be "members" of card networks. These member banks sponsor

4

payment processors (such as Global) so they may process transactions through the card networks.

(e)    The Merchant Acquirer – this company is an independent sales organization ("ISO") that markets the payment processor's services to merchants and aggregates accounts of smaller ISOs or Merchant Service Providers ("MSPs"), who deal directly with merchants.  Merchant acquirers and smaller ISOs/MSPs essentially act as a "middleman" between merchants and payment processors. They enroll merchants in payment processing services, ensure that the services are working properly, and provide customer support to the merchant.  Additionally, they sometimes distribute monthly invoices or statements reflecting fees and charges to the merchant (where processors do not fulfill this function).  Defendant NAB is a merchant acquirer.

6.    Ordinarily, a merchant that wants to accept credit and debit cards as a form of payment contracts with a payment processor and/or merchant acquirer to obtain such services.  This contract sets forth the fees that the merchant will be charged, and commonly consists of two parts:

(a)    "Pass Through" Costs – these charges consist of the card network "assessments," including interchange fees, access fees, and other assessments imposed by card networks.  These are set costs that apply universally

and without variation at any given time, regardless of the identity of the merchant. These costs are uniform, unavoidable, and are "passed through" at cost to the merchant on its monthly billing statement by the processor and merchant acquirer.

(b)     Payment Processing Fees – these are the fees which the merchant is charged by the payment processor and/or merchant acquirer for payment processing services.  Unlike interchange fees, access fees, and other assessments, these fees are negotiated on the front end of the parties' relationship. They can include at least two types of charges: per-transaction processing fees (the margin the processor and/or merchant acquirer imposes as a fee for services rendered in connection with processing payments) and flat service fees, such as monthly maintenance fees.  They are ordinarily disclosed and agreed in the merchant's application to obtain payment processing services and are itemized on the merchant's monthly billing statement.

7.     The number of parties involved, the complexity of the invoices, the existence of so many moving pieces involved in calculating the amounts shown on the invoices, and other factors makes it difficult, particularly for small- and medium-sized merchants, to understand whether card processing companies are only charging fees allowed by their contracts.

8.      Unfortunately, some unscrupulous companies that implement and service payment card processing systems take advantage of this complexity and the confusion it engenders.  They induce merchants to execute standardized contracts for their services with the promise of straightforward, transparent pricing, but then surreptitiously implement small mark-ups and impermissible junk fees.

9.      These improper fees are assessed for the sole purpose of raising additional revenue for the processor and/or merchant acquirer at the merchants' expense.  It is a classic case of bilking the client that, due to the lack of regulation in the payment processing industry and the relatively small sums of money at stake for any individual merchant, almost always goes unchallenged.

10.     Over several years, Defendants have perpetrated this scheme to generate tens or hundreds of millions of dollars from thousands of merchants.  This case challenges the amount and nature of certain inflated assessments, as well as junk fees, that have been imposed upon unsuspecting merchants such as Plaintiffs. Such fees violate the express terms of the parties' standardized form "Merchant Service Agreement" (the "Agreement," a recent exemplar of which is attached hereto as Exhibit 1) as well as the covenant of good faith and fair dealing. Furthermore, several pertinent provisions of the adhesive Agreement are unconscionable or otherwise unenforceable.  Additionally, the fees charged are

7

unjust and it would be inequitable for Defendants to retain them. Finally, Defendants fraudulently misrepresented and/or omitted key facts concerning their billing practices both in the Agreement and in monthly statements.

11.     Plaintiffs seek monetary as well as injunctive and declaratory relief, individually and on behalf of all other merchants similarly situated, to remedy Defendants' unlawful, deceptive, and unfair conduct.

## II. <u>PARTIES</u>

12.     Plaintiff Lucky 7 is a Michigan corporation and has its principal place of business in Michigan. Lucky 7 is a merchant that owns and operates a Chinese food restaurant in Ypsilanti, Michigan. Lucky 7 received payment processing services from Defendants from 2013 to 2016.

13.     Plaintiff Dinner Bell is an Arizona corporation and has its principal place of business in Arizona. Dinner Bell previously operated a restaurant in Prescott, Arizona. Dinner Bell received payment processing services from Defendants from approximately April 2013 to December 2013.

14.     Plaintiff Bill's Pizza is a sole proprietorship with its principal place of business in Palm Springs, California. Bill's Pizza's sole proprietor, William Tracy, is a resident and citizen of the State of California. Bill's Pizza received payment

processing services from Defendants from approximately April 2013 to December 2013.

15.     Plaintiff Bill's Grill is an Arizona limited liability corporation that was terminated in July 2016.  Bill's Grill received payment processing services from Defendants from approximately April 2013 to December 2013.  Pursuant to Ariz. Rev. Stat. § 29-784, Bill's Grill continues in existence for the purpose of its legal claims, filed in this Court on August 31, 2015.

16.     Defendant NAB is a privately-held Delaware limited liability company with its principal place of business in Troy, Michigan.  NAB is one of the world's largest merchant acquirers.  NAB provides merchant services to more than 250,000 merchants nationwide and has annual revenues of over $500 million.

17.     Defendant Global is a New York corporation with its principal place of business in Atlanta, Georgia.  Global is a multinational payment processor that, according to its websites, services 1.5 million merchants in 29 countries and generates $2.6 billion in revenue per year.

### III.   JURISDICTION AND VENUE

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 Class members; the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs; and at least

one Class member is a citizen of a state different from Defendants.  As a limited liability company, NAB is considered an "unincorporated association" for purposes of jurisdiction under the Class Action Fairness Act.  28 U.S.C. § 1332(d)(10).

19.    This Court has personal jurisdiction over Defendants because they both conduct substantial business within the State of Georgia, such that they have significant, continuous, and pervasive contacts with this State.  Jurisdiction also exists because the Merchant Service Agreement (Exhibit 1) specifies this Court as the proper forum for any litigation arising out of or relating to that document or the relationships it creates.

20.    Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendants both conduct business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district. Venue is also appropriate in the Atlanta division of this Court.

### IV.    COMMON FACTUAL ALLEGATIONS

**A.    Merchants Contract for Transparent, Low Cost Payment Processing Services.**

21.    According to its website, NAB "help[s] those striving for the American dream achieve it by providing them access to industry-leading merchant

services."  NAB purports to offer "some of the lowest rates for payment processing you can find today."

22.   NAB specializes in enrolling merchants in payment processing services.  Thereafter, NAB is charged with ensuring that the services are working properly, providing customer support to merchants, and handling monthly billing and collections.

23.   The predominant pricing model used by NAB and other merchant acquirers is "interchange-plus," or "cost-plus," pricing.  According to this pricing model, merchants are required to pay the actual assessments established by the card networks, including access fees (Visa APF fees, MasterCard NABU fees, and Discover access fees) and other assessments, as well as actual interchange rates. Companies like NAB and Global are paid for their services in accordance with a separate negotiated rate (the "plus" component of interchange-plus).

24.   Other pricing models, such as "tiered rate" pricing, may also require merchants to pay actual card association assessments, but interchange-plus pricing is widely regarded as the most transparent pricing model offered by merchant acquirers and payment processors.   Interchange-plus pricing requires that processors itemize the fees charged to merchants, including any separate mark-up charged by the processor or other authorized third party.

25.     As one industry publication states, "Interchange-plus is the most transparent, cost-effective form of merchant account pricing.  The separation of processing costs with interchange-plus also allows for the optimization of interchange expenses. … By passing interchange fees directly to merchants with a fixed markup, surcharges and hidden costs are generally eliminated." (http://www.cardfellow.com/blog/interchange-plus-pricing/).

26.     NAB does not, however, process payments itself.  Rather, such services are provided through Global, a back-end payment processing technology company, or another back-end payment processing technology company, First Data Corporation ("First Data").

27.     NAB has partnered with Global to provide payment processing services to merchants for well over a decade.

28.     Whenever NAB solicits business from a merchant, it provides the merchant with a form Merchant Service Agreement (see Exhibit 1).   The Agreement consists of two parts: (a) the Merchant Application ("Application"), which occupies the first page and the last two pages of the Agreement; and (b) the Terms and Conditions of Merchant Service Agreement ("Terms"), which occupies the rest of the Agreement.

29.    NAB is not specifically identified as a party to the Agreement.  *See* Exhibit 1 at 2 (identifying merchant, Global, and the member bank as the parties to the contract).

30.    Nevertheless, NAB is a party to the Agreement.  NAB's logo and phone number are prominently featured on the top of the Application.  *See* Exhibit 1 at 1.  The Application also directs merchants to address "[a]ll questions regarding merchant processing" to NAB.  *Id.*   There is also a signature block on the Application for "Application Accepted by ISO."  *Id.* at 11.  Because NAB is the independent sales organization, or ISO, in Plaintiff's transaction, this signature block is clearly intended for NAB.

31.    Moreover, the Terms impose obligations on NAB.  *See* Exhibit 1 at 11 (authorizing NAB to "initiate automated deposit or debit (ACH) entries to [Plaintiff's] bank account" and to collect merchant fees, "subject to and only as pursuant to [NAB's] separate written agreement with Global Direct").   As the Court held in its Order denying NAB's Rule 12(b)(6) dismissal motion, "The 'separate written agreement with Global Direct' was incorporated by reference into the merchant service agreements."  Order at 7, *The Dinner Bell Café, Inc., et al. v. North American Bancard, LLC*, No. 1:15-cv-3059-SCJ, Dkt. No. 36 (N.D. Ga. Aug. 4, 2016).

13

32.     The Merchant Application identifies the fees and charges to which the merchant will be subject if it decides to enroll in Defendants' services.   The Application contains a "Pricing Schedule" that explicitly provides that merchants will be subject to two general types of charges.  *See* Exhibit 1 at 11.

33.     The first general category of charges, under both "Retail" and (if applicable) "MOTO/Internet," is cost-plus pricing.   Under this method of pricing applicable to both swiped transactions and internet-based transactions, the interchange rates, access fees, and other assessments set by the card networks are passed through to the merchant *at cost* and the merchant is separately charged an additional disclosed amount representing the payment processing fees to which Defendants are entitled (*i.e.*, the interchange rates, access fees, and other assessments together comprise the "cost" in "cost-plus" pricing, and the "plus" is Defendants' negotiated fee).

34.     The Pricing Schedule uniformly and expressly represents that charges established by the card associations – *i.e.*, "assessments" – will be passed through at cost to merchants.

35.     Plaintiffs are aware of two materially identical versions of the relevant language in the Application.

36.     In the version last revised in December 2013 (attached as Exhibit 1), the Application states, "*[c]ard association assessments will be passed through*," and sets forth the card association access fees that Defendants will charge the merchant. *Id.* at 11.

37.     In a version of the Application last revised in October 2011 – the version that all Plaintiffs signed – the Application states, "*[a]ctual interchange passthrough and assessments* plus [X] BPS,"[1] and sets forth the card association access fees that Defendants will charge the merchant. *See* Exhibit 2 (Dinner Bell Application) at 10; Exhibit 3 (Bill's Pizza Application) at 10; Exhibit 4 (Bill's Grill Application) at 10; Exhibit 5 (Lucky 7 Application) at 10.

38.     The two versions of the relevant language in the Pricing Schedule are materially identical because, as alleged above, "assessments" is a term that includes any non-negotiable charges established by the card networks, including interchange fees, access fees, and other assessments.

39.     In addition to such cost-plus pricing representations, the Application also specifically identifies the second category of charges – "Other Fees" – to which the merchant will be subject "if applicable." *Id.* These fees could include,

---

[1] The specific number of basis points individual merchants agree to pay is subject to negotiation between the merchant and Defendants, and forms no part of the claims asserted herein. This disclosed fee reflects processing service fees.

*inter alia*, various monthly fees (*e.g.*, "Wireless Network Access (Monthly)," "Debit Gateway Fee (Monthly)," "Monthly Basic Service Fee," "Statement Mailing Fee"), per-transaction fees (*e.g.*, "Touch Tone Transactions," "T&E Draft Capture Transactions," "Wireless Transaction Fee," "Debit Transaction"), annual fees (*e.g.*, "Annual Fee"), and other types of fees (*e.g.*, "Batch Header," "Monthly Minimum Discount Fee,"[2] "Chargeback Fee," "Retrieval Fee").

40.    The Application thus informs the merchant – in clear, unambiguous terms – what it will be charged if it agrees to enroll in Defendants' services and how such charges will be calculated.

41.    This transparency is very important because the Agreement extends for a set period of time, typically three years.  If a merchant desires to end its relationship with Defendants prior to the expiration of this term, it often must pay an early termination fee of several hundred dollars, which provides a powerful incentive to maintain the relationship even in the face of small-value overbilling (assuming a merchant even detects the concealed overbilling in the first place).

---

[2] "Monthly Minimum Discount Fee" is not a monthly fee, but a fee imposed if and only if the merchant submits a volume of transactions that falls below a certain specific monthly minimum volume.

42.     Those merchants that are interested in doing business for the specified fees identified in the Application sign it.   The information contained in the Application is part and parcel of the deal.

43.     Further, the same Merchant Application is used by NAB regardless of which back-end processing technology company (*i.e.*, Global or First Data) NAB has partnered with to service any particular merchant account.   Accordingly, NAB makes identical representations in the Application to merchant clients that NAB services in partnership with Global and to merchant clients it services in partnership with First Data.

**B.      Defendants Systematically Overcharge Their Merchants.**

44.     Over the course of its relationship with merchants, NAB imposes payment processing fees that do not comport with those set forth in the Application.   These inflated fees are imposed for no other reason than to improve NAB's bottom line (and that of its passive partner, Global).

45.     Upon information and belief, NAB chooses what fees to impose on merchants that are above and beyond those set forth in the Agreement.   NAB then provides specifications to Global as to the nature and amount of future merchant overcharges (e.g., what new junk fees to impose and when, what pass-through

assessments to increase, when to increase them, etc.), and Global carries out the process of preparing NAB-branded merchant invoices.

46.    Despite being a named party to the Agreements and knowing that such fees are unlawful and impermissible, Global nevertheless ensures that merchants are charged these inflated amounts, and is therefore culpable in the scheme alleged herein.

47.    It is currently unknown which Defendant actually distributes the monthly statements to merchants and/or debits the charges from merchants' accounts.  For example, NAB is identified at the top of each statement, but the form and format of the statement appears to be generated by Global (as evidenced by the fact that it is very similar to statements used by merchant acquirers other than NAB that have partnered with Global).  Regardless, it is clear that both Defendants are integral cogs in the scheme and share in its proceeds.  Discovery will reveal the precise nature of each Defendant's back-office role.

48.    The various unlawful, impermissible, and inflated fees imposed by Defendants on Plaintiffs and other Class members are described in more detail below.

***Junk Fees***

49.     First, Defendants charged several types of fees that are simply not set forth in Plaintiffs' Applications.

    a.    *Dinner Bell.*  Among the fees that were charged to Dinner Bell that are mentioned *nowhere* in the Application (Exhibit 2) are: (i) a "fixed acquirer network fee" ($4.00/month); (ii) a "PCI monthly non-compliance fee" ($14.95/month); (iii) a "www.mypci.com" fee ($24.95); and (iv) a "regulatory fee" ($99.00).

    b.    *Bill's Pizza.*  Among the fees that were charged to Bill's Pizza that are mentioned *nowhere* in the Application (Exhibit 3) are: (i) a "fixed acquirer network fee" ($4.00/month); (ii) a "www.mypci.com" fee ($24.95); and (iii) a "PCI monthly non-compliance fee" ($14.95/month).

    c.    *Bill's Grill.*  Among the fees that were charged to Bill's Grill that are mentioned *nowhere* in the Application (Exhibit 4) are: (i) a "fixed acquirer network fee" ($4.00/month); (ii) a "www.mypci.com" fee ($99.00); (iii) a "PCI monthly non-compliance fee" ($14.95/month); and (iv) a "regulatory fee" ($99.00).

    d.    *Lucky 7.*  Among the fees that were charged to Lucky 7 that are mentioned *nowhere* in the Application (Exhibit 5) are: (i) an annual PCI service fee

($79.00 to $99.00/year); (ii) a PCI monthly non-compliance fee ($6.95 to $29.95/month); (iii) a "regulatory fee" ($99.00); (iv) a PCI scan fee ($64.95); and (v) an EMV readiness fee ($29.99).

50.     On information and belief, Defendants similarly charged other Class members for fees that were not set forth in the Class members' Applications.

51.     Second, Defendants charged Lucky 7 several types of fees that, although included as "Other Fees" in the Application, were not denoted as being applicable to Lucky 7, including: (a) a monthly minimum discount fee ($25.00); (b) batch header fees ($0.35/unit); and (c) a chargeback fee ($25.00).

52.     On information and belief, Defendants similarly charged other Class members for identified "Other Fees" that were not authorized by the Applications submitted by such Class members.

53.     Third, Defendants charge a fee for My Biz Perks, a supplementary merchant service, earlier than this charge is permitted by the terms of the Agreement.  The Application specifically states that merchants would not be charged for My Biz Perks before a "60-day free trial" expires.  Lucky 7 was charged a monthly fee of $11.95 prior to the expiration of the 60-day trial.  On information and belief, Defendants routinely charged other Class members a fee

denoted as "My Biz Perks" (or "www.mybizperks.com") of $11.95 that is contrary to the terms of the contract and without merchant authorization.

54.    Each of the categories of overcharges alleged in paragraphs 49-53 are hereinafter referred to as "Junk Fees."

### *Inflation of Assessments*

55.    Next, Defendants systematically overcharge merchants for certain pass-through assessments established by the card networks (Visa, MasterCard, etc.).    These overcharges are added onto ordinary pass-through assessments including access fees (Visa APF and MasterCard NABU fees) and other assessments established by the card networks.

56.    Although Defendants represented in each Plaintiff's Application that they would charge Plaintiffs "***actual interchange passthrough and assessments*** plus [X] BPS," in fact, they illegally and impermissibly inflated certain assessments.

57.    Plaintiffs Dinner Bell, Bill's Pizza, and Bill's Grill each agreed to pay Defendants a processing fee equal to 58 basis points of processing volume.  *See* Exhibits 2-4.  Plaintiff Lucky 7 agreed to pay Defendants a processing fee equal to 50 basis points of processing volume.  *See* Exhibit 5.

58.     The amounts, in basis points, that each Plaintiff agreed to pay in addition to actual pass-through fees are reflected in the "discount rate" indicated on each Plaintiff's monthly statements under "DISC RATE."  Those charges are not a subject of this litigation.

59.     But in addition to charging Plaintiffs and other Class members the agreed-upon processing fee in the form of basis points (discount rates), Defendants secretly inflated the access fees and card network assessments for which Plaintiffs were charged.

60.     ***Access Fees.***  The appropriate Visa, MasterCard, and Discover access fee rates relevant to the Class Period are as follows: (i) Prior to July 2012, all Visa transactions incurred an APF fee of $0.0195; (ii) from July 2012 to the present, Visa credit transactions continued to incur an APF fee of $0.0195; (iii) from July 2012 to the present, Visa debit transactions incurred an APF fee of $0.0155; (iv) prior to June 2013, all MasterCard transactions incurred a NABU fee of $0.0185; (v) from July 2013 to the present, all MasterCard transactions incurred a NABU fee of $0.0195; (vi) prior to April 2016, all Discover transactions incurred an access fee of $0.0185; and (vii) from April 2016 to the present, all Discover transactions incur an access fee of $0.0195.

61.   Notwithstanding the actual access fee rates provided above, the Application provides slightly different rates in the Pricing Schedule.  In particular, each Plaintiff agreed to pay MasterCard NABU rates of $0.0198 per transaction and Visa APF rates of $0.0218 per transaction, as well as the actual Discover access fee rate of $0.0185.  *See* Exhibits 2-5.

62.   Defendants routinely overcharged all Plaintiffs for card association access fees, *i.e.*, Visa APF, MasterCard NABU, and Discover access fees, as described in this paragraph.

a.   *Dinner Bell*.  Between at least August 2013 and December 2013, Dinner Bell was charged $0.0378 per Visa transaction, $0.0368 per MasterCard transaction, and $0.0345 per Discover transaction.  This represents inflation of $0.0160, or 1.6¢, per transaction.

b.   *Bill's Pizza*.  Between at least August 2013 and September 2013, Bill's Pizza was charged $0.0378 per Visa transaction, $0.0368 per MasterCard transaction, and $0.0345 per Discover transaction.  This represents inflation of $0.0160, or 1.6¢, per transaction.

c.   *Bill's Grill*.  Between at least August 2013 and September 2013, Bill's Grill was charged $0.0378 per Visa transaction, $0.0368 per

MasterCard transaction, and $0.0345 per Discover transaction.  This represents inflation of $0.0160, or 1.6¢, per transaction.

d.   *Lucky 7*.  Between at least July 2013 and March 2014, Lucky 7 was charged $0.0378 per Visa transaction, $0.0368 per MasterCard transaction, and $0.0345 per Discover transaction.  This represents inflation of $0.0160, or 1.6¢, per transaction.  Between at least April 2014 and April 2016, Lucky 7 was charged $0.0478 per Visa transaction, $0.0468 per MasterCard transaction, and $0.0445 per Discover transaction.  This represents inflation of $0.0260, or 2.6¢, per transaction.

63.   On information and belief, Defendants similarly charged other Class members inflated Visa APF, MasterCard NABU, and Discover access fees.

64.   ***Other Assessments.***   The card networks also charge assessments based on the total volume of transactions processed.  These assessments are measured in basis points.  During the Class Period, the appropriate amounts of these assessments were as follows: (i) prior to January 2015, all Visa volume incurred assessments of 11 basis points; (ii) from January 2015 to the present, Visa credit volume has incurred assessments of 13 basis points; (iii) from January 2015 to July 2016, Visa debit volume incurred assessments of 11 basis points; (iv) from July 2016 to the present, Visa debit volume has incurred assessments of 13 basis

points; (v) prior to January 2015, all MasterCard volume incurred assessments of 11 basis points; (vi) from January 2015 to the present, all MasterCard volume (excluding transactions over $1,000) has incurred assessments of 12 basis points; (vii) prior to April 2015, all Discover volume incurred assessments of 10.5 basis points; (viii) from April 2015 to April 2016, all Discover volume incurred assessments of 11 basis points; and (ix) from April 2016 to the present, Discover volume has incurred assessments of 13 basis points.

65.     The Application does not modify these rates.

66.     Defendants routinely overcharged all Plaintiffs for these additional assessments, as described in this paragraph.

a.     *Dinner Bell*.   Between at least August 2013 and December 2013, Dinner Bell was charged 16 basis points for Visa transactions (an inflation of 5 basis points), 17 basis points for MasterCard transactions (an inflation of 6 basis points), and 15.5 basis points for Discover transactions (an inflation of 5 basis points).

b.     *Bill's Pizza*.   Between at least August 2013 and September 2013, Bill's Pizza was charged 16 basis points for Visa transactions (an inflation of 5 basis points), 17 basis points for MasterCard transactions (an inflation of 6 basis

points), and 15.5 basis points for Discover transactions (an inflation of 5 basis points).

c.    *Bill's Grill.* Between at least August 2013 and September 2013, Bill's Grill was charged 16 basis points for Visa transactions (an inflation of 5 basis points), 17 basis points for MasterCard transactions (an inflation of 6 basis points), and 15.5 basis points for Discover transactions (an inflation of 5 basis points).

d.    *Lucky 7.* Between at least July 2013 and March 2014, Lucky 7 was charged 16 basis points for Visa transactions (an inflation of 5 basis points), 17 basis points for MasterCard transactions (an inflation of 6 basis points), and 15.5 basis points for Discover transactions (an inflation of 5 basis points). From April 2014 on, Lucky 7 was charged 19 basis points for Visa, MasterCard, and Discover transactions (an inflation of 6-8 basis points depending on the date, in light of the card network amendments to these charges in January 2015 and April 2015, alleged above).

67.    Defendants thus systematically increased the Visa, MasterCard, and Discover assessments – which are listed separately on Plaintiffs' monthly statements – by five or more additional basis points per transaction. This tactic artificially increased the amount all Plaintiffs were required to pay for assessments

that were unequivocally required to be "passed through," and thus artificially inflated Defendants' revenues at Plaintiffs' expense.

68.     By inflating card network assessments in this way, Defendants pilfered untold amounts of money from Class members in the aggregate, but relatively small amounts on a per-merchant basis.

69.     Defendants have built into the Agreement a strong disincentive for merchants who suspect that have been overcharged to terminate their relationships with Defendants, that is a substantial early termination fee if the term has not yet expired.  Merchants that are subject to the early termination fee are essentially put to a Hobson's Choice – pay the early termination fee (often in excess of $295.00) or accept the overbilling.

**C.     Defendants Endeavor to Legitimize Their Overbilling Via Adhesive Terms.**

70.     To further harm merchants and protect themselves, Defendants have buried oppressive provisions in the adhesive Terms.

71.     The Terms are boilerplate and are not negotiable; they are presented to merchants on an adhesive, take-it-or-leave-it basis.  The Terms consist of small font text occupying more than 30 densely-worded paragraphs over nine pages.

72.     The Terms represent a unilateral effort by Defendants to:    (a) backtrack from the express representations about fees and pricing included in the

Application (including the Pricing Schedule); and (b) immunize themselves from liability for their egregious misconduct.

73.   The Terms include clauses purporting to:

(a)   give Defendants broad discretion to change the amounts of agreed-upon fees or impose new fees (Ex. 1 at 2-3, 5);

(b)   limit Defendants' liability to one month's worth of overcharges (*id.* at 4);

(c)   limit the statute of limitation for claims related to "billing errors" to 90 days (*id.*);

(d)   require merchants to pay attorneys' fees in any legal action (regardless of whether Defendants are deemed the prevailing parties and even if merchants prove that Defendants engaged in fraud or other intentional wrongdoing) (*id.* at 6);

(e)   prohibit merchants from pursuing their claims in a class action (*id.*); and

(f)   prohibit merchants from enforcing their right to a jury trial (*id.*).

74.   These provisions violate public policy, lack mutuality, are unconscionable, constitute improper exculpatory clauses, and are otherwise void and unenforceable under Georgia law.

28

**D.    Defendants' Practices Have Harmed Plaintiffs and the Other Class Members.**

75.    The deceptive, wrongful overbilling policies and practices described above harmed Plaintiffs and the other Class members.

76.    All Plaintiffs were merchant customers of Defendants beginning in early 2013.   Defendants victimized and damaged each Plaintiff through the overbilling practices described herein.   Specifically, Defendants charged Plaintiffs Junk Fees that were not identified in the Application (or identified as being inapplicable to Plaintiffs) and, as described in detail above, inflated access fees and other assessments above and beyond the "pass-through" charges they expressly agreed to pay.

77.    Defendants did not single out Plaintiffs for this treatment, but rather perpetrated a systematic scheme of merchant exploitation designed to inflate Defendants' bottom line at the direct expense of their merchant clients.

78.    Defendants were well aware of the fraudulent and otherwise improper nature of their conduct for the duration of the Class Period and, in fact, intentionally inflated their fees to injure Plaintiffs.

79.    The inflated charges on Plaintiffs' invoices are not assessed randomly or the result of sporadic errors.   Rather, the inflated charges are imposed by Defendants to carry out their fraudulent scheme using one or more computer

algorithms that they have designed and which are based upon information provided by NAB's merchant accounting and/or accounts receivable department.

80.     There is also direct evidence that Defendants acted intentionally for fraudulent purposes.

81.     In October 2014, David Reiter, the merchant account representation that facilitated certain Plaintiffs' relationships with NAB (namely, Dinner Bell, Bill's Pizza, and Bill's Grill), attended an NAB-operated Sales Conference in Detroit, Michigan, at which NAB executives gave presentations to merchant account representatives and others about their business activities.

82.     At the conclusion of this Sales Conference, NAB's chief executive officer, Marc Gardner, made himself available for a question-and-answer session. This portion of the conference was videotaped.  The videotape is in the possession of NAB.

83.     At that question-and-answer session, Mr. Reiter pointedly asked Mr. Gardner about NAB's decision to increase the pass-through assessments it charges to merchants without disclosing that those fees have been marked up by NAB.

84.     Mr. Reiter expressly raised with Mr. Gardner the virtually identical practices of Mercury Payment Systems ("Mercury"), a competitor of NAB that had recently been sued in the Northern District of California by Heartland Payment

Systems ("Heartland") under the Lanham Act and various California state statutes prohibiting unfair competition and fraudulent business practices. *See Heartland Payment Systems, Inc. v. Mercury Payment Systems LLC*, No. 4:14-cv-00437-CW (N.D. Cal.).

85.    In response, Mr. Gardner dismissed the notion that NAB was following in Mercury's footsteps, and explained that, on the contrary, "***We show Mercury the way***" with respect to extracting a premium from merchant clients.

86.    Mr. Gardner's candid admission demonstrates unequivocally that NAB acted intentionally and for the purpose of deceiving its customers when it inflated charges on their invoices as described in this complaint.

87.    As a direct consequence of Defendants' overbilling policies and practices, Plaintiffs and the other Class members have wrongfully paid unauthorized fees and charges. Defendants have improperly deprived the entire Class of significant funds, causing each Class member to sustain damages. Because Defendants' practices of imposing unauthorized junk fees and inflating various assessments were applied to the other Class members' accounts (of which there may be over 250,000) in an automated fashion, Defendants have potentially pilfered hundreds of millions of dollars from their clients.

88.    Thus, due to Defendants' improper charges and fees, and false and misleading statements, as alleged herein, Defendants have wrongfully deprived Plaintiffs and the other Class members of funds to which Defendants have no legitimate claim.

**E.    Defendants Fraudulently Induced All Affected Merchants to Enter into Merchant Service Agreements.**

89.    The Terms of the Agreement, including the Pricing Schedule, are provided to all merchants prior to the formation of a business relationship between merchants and Defendants.

90.    Indeed, a merchant's execution of an Application (included in Exhibit 1) is a prerequisite to obtaining payment card processing services from Defendants. Defendants must "accept" an Application before they will begin to provide such services.

91.    The inflated assessments, including card association access fees and other assessments, that are charged by Defendants are not disclosed in the Terms of the Agreement or in the Application.  Further, the fact that Defendants can, may, or will inflate those fees is not disclosed in the Terms of the Agreement or in the Application.  Neither is the fact that Defendants do not intend to honor their statements in the Application (including the Pricing Schedule) disclosed in the Terms of the Agreement or in the Application.

92.     The amount and nature of the fees charged by Defendants to process payment card transactions is material to Plaintiffs and all merchants.  The purpose for which any merchant contracts to receive payment card processing services is to process customer credit and debit cards for goods or services sold by the merchant to the customer at the lowest possible rate.  Defendants are financial middlemen. Any fees imposed by such intermediaries as Defendants necessarily detract from merchants' income.

93.     NAB admits that the amount and nature of the fees it charges to merchants are important to merchants.  For example, on its website, NAB advertises its services by advising prospective clients to, "Look for the lowest interchange       fees."             (http://blog.nabancard.com/category/merchant-accounts/page/2/).  NAB also advises prospective clients that, "Interchange plus is a   better   plan   for   merchants   …   because   the   pricing   is   better." (http://blog.nabancard.com/merchant-account/understanding-your-credit-card-processing-statements/).

94.     Plaintiffs justifiably relied on Defendants' agreement – as reflected in the Pricing Schedule of their respective Applications – to pass through without inflating the card networks' various assessments, including access fees and other assessments, for which Plaintiffs would be liable.  Plaintiffs' reliance on the

express terms of the Application, including the Pricing Schedule, was justified because Defendants provided no basis to doubt the accuracy and truthfulness of those terms and the prices quoted.

95.    Based on Plaintiffs' reviews of the rates promised by Defendants and their competitors at the time Plaintiffs agreed to engage Defendants, Defendants had the most favorable rates.   Upon this basis, Plaintiffs contracted with Defendants rather than their competitors to obtain credit and debit card processing services.

**F.    Defendants' Class Action Waiver Clause Is Unenforceable.**

96.    Section 25 of the Terms contains a number of unenforceable provisions, including a statement purporting to waive merchants' right to participate in class actions.

97.    Section 25 is called "CHOICE OF LAW/ATTORNEY'S FEES/JURY TRIAL WAIVER."   The title of this section makes no reference to a class action waiver clause.   The section contains no typographical enhancements (such as bolded, capitalized, or italicized text) that might otherwise call attention to such a waiver clause.

98.     The section uses a small font, is buried six pages into the Terms, and is written in a confusing manner.   It uses baroque dependent clauses and misleading run-on sentences.

99.     In full, section 25 provides:

> Should it be necessary for Global or Member to defend or enforce any of its rights under this Agreement in any collections or legal action, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action.   Without limiting the generality of the foregoing, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, incurred by Global and/or Member in enforcing or defending its rights under this Section 24 [sic], without regard to whether there has been an adjudication on the merits in any such action.   Merchant waives trial by jury with respect to any litigation arising out of or relating to this Agreement. Global, Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort, or otherwise) arising out, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties.   Global, Member, and Merchant agree that all actions arising out, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.

100.    The class action waiver language in section 25 of the Terms is improperly exculpatory under Georgia law and will not be enforced by Georgia courts.    Under Georgia law, exculpatory clauses are contractual "provisions entirely restricting remedies" or "waiv[ing] substantial rights." *JVC America, Inc. v. Guardsmark, LLC*, 2006 WL 2443735, at *11 (N.D. Ga. Aug. 22, 2006).   This clause is designed to severely restrict or eliminate remedies available to Defendants' merchant clients and to insulate Defendants from liability.   If Plaintiffs are forced to seek relief for Defendants' overbilling on an individual, non-class basis, it would make no economic sense for them to proceed with this

case in light of the modest individual damages Plaintiffs and each Class member has suffered and in light of certain other provisions in section 25, including the clause purporting to require merchants to pay attorneys' fees regardless of any adjudication on the merits of any controversy arising out of the Agreement.

101.   In addition to being improperly exculpatory, it is procedurally and substantively unconscionable, and is unenforceable for that further reason.

102.   The Supreme Court has acknowledged that, "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

103.   As the Eleventh Circuit Court of Appeals has further recognized, "the effort and cost of investigating and initiating a claim may be greater than many claimants' individual stake in the outcome, discouraging the prosecution of these claims absent a class action filing procedure." *In re Charter Co.*, 876 F.2d 866, 871 (11th Cir. 1989).

104.   Consequently, if the class action waiver clause purportedly contained in section 25 of the Terms were deemed enforceable, all merchants damaged by Defendants' fraudulent and otherwise unlawful practices, as alleged herein, will be

denied a remedy for their injuries.  Because the amount of any one merchants' losses from the inflated fees charged by Defendants is modest, individual merchants have no financial incentive to pursue litigation and every reason not to do so.  The expense of litigation is such that no merchant would invest the time or resources necessary to sue Defendants absent a mechanism for collective action. This factor strongly weighs against the validity of Defendants' purported class action waiver clause.  *Dale v. Comcast Corp.*, 498 F.3d 1216, 1221-24 (11th Cir. 2007).

105.  Further, the purported class action waiver clause is unenforceable because all merchants, including Plaintiffs and the other Class members, were induced to entered into contracts with Defendants on the basis of Defendants' fraudulent misrepresentation of the fees they would be charged, and/or on the basis of Defendants' fraudulent omission of the fact that the pass-through assessments established by the card networks would be inflated.

106.  Defendants included the class action waiver clause in their form Agreement for the specific purpose of attempting to immunize their fraudulent scheme from legal attack, knowing that individual customers had no viable legal remedy because the expense of litigation far exceeded their losses.  The class

action waiver clause thus was a part and parcel of the fraud perpetuated by Defendants.

107.   As a result, the purported class action waiver is void or voidable.

## V. **CLASS ACTION ALLEGATIONS**

108.   Plaintiffs bring this action individually and on behalf of all others similarly situated as a class action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

109.   The Class includes the "Assessments Class" and the "Junk Fee Class."

110.   The Assessments Class is defined as follows:

> All those who signed a Merchant Application containing the words "Actual interchange passthrough and assessments" or "Card association assessments will be passed through," and paid to Defendants any Visa, MasterCard, or Discover assessment exceeding the amount stated in the Merchant Application or, where no amount is stated, exceeding the amount established by Visa, MasterCard, or Discover, as applicable.

> The phrase, "any Visa, MasterCard, or Discover assessment" includes card association access fees (Visa APF, MasterCard NABU, or Discover access fees) and other assessments, including assessments computed using a fixed number of basis points.

111.   The Junk Fee Class is defined as follows:

> All those who signed a Merchant Application and paid to Defendants any Junk Fee, *i.e.*, any flat fee not expressly identified as applicable to that person or entity in the Merchant Application.

112.   Plaintiffs reserve the right to amend these Class definitions.

38

113.   Excluded from the Class are Defendants, their parents, subsidiaries, affiliates, officers, and directors, any entity in which Defendants have a controlling interest, all customers who make a timely election to be excluded, the government, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

114.   The Class Period begins on the earliest date allowed by the statute of limitations applicable to each cause of action, and proceeds until such time as Defendants remedy the conduct complained of herein.  Based on Georgia's statute of limitations for breach of contract actions, the Class Period is likely to begin six years prior to the date on which any Plaintiff in this consolidated action filed a complaint (August 31, 2015), if the contract is held to be enforceable.

115.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

116.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**   The members of the Class are so numerous that individual joinder of all the members is impracticable.  On information and belief, there are not less than tens of thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged

herein.  The precise number of Class members and their addresses are presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records.  Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

117.  **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  Numerous common questions of law and fact exist as to Plaintiffs and the other Class members.  Such questions Class include, but are not limited to:

a.      Whether Defendants acted and continue to act unlawfully, unfairly, deceptively, misleadingly, and/or fraudulently by inflating assessments, including access fees and other assessments, charged to merchants, including Plaintiffs and the other Class members, for Defendants' own benefit;

b.      Whether Defendants acted and continue to act unlawfully, unfairly, deceptively, misleadingly, and/or fraudulently by imposing Junk Fees charged to merchants, including Plaintiffs and the other Class members, for Defendants' own benefit;

c.      Whether Defendants' conduct alleged herein breached the terms of their contracts with merchants, including Plaintiffs and the other Class members;

d.      Whether Defendants' conduct alleged herein violated the covenant of good faith and fair dealing applicable to their contracts with merchants, including Plaintiffs and the other Class members;

e.      Whether Defendants fraudulently induced merchants, including Plaintiffs and the other Class members, to contract to receive payment card processing services;

f.      Whether Defendants required merchants, including Plaintiffs and the other Class members, to enter into contracts containing exculpatory, unconscionable, or otherwise unenforceable provisions;

g.      Whether any provision in the Merchant Service Agreement is exculpatory, unconscionable, or otherwise unenforceable;

h.      Whether Defendants were unjustly enriched through their billing practices;

i.      Whether Defendants are liable to Plaintiffs and the other Class members for inflating card network assessments, including access fees and other assessments, for Defendants' own benefit;

j.      Whether Defendants are liable to Plaintiffs and the other Class members for imposing Junk Fees for Defendants' own benefit; and

k.      Whether Defendants should be enjoined from engaging in any or all of the unlawful, unfair, deceptive, misleading, and/or fraudulent practices complained of herein.

118.   Defendants have engaged in a common course of conduct toward Plaintiffs and the other Class members.   The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues.   Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

119.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**   Plaintiffs' claims are typical of the other Class members' claims because, among other things, all members of the Class were comparably injured through the uniform misconduct described above.

120.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**   Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action

vigorously.  Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

121.  **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

122.  **Predominance and Superiority – Federal Rule of Civil Procedure 23(b)(3).**  Issues common to the Class as a whole predominate over issues relating to individual Class members.  Moreover, a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class members to individually seek redress for Defendants' wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

123.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

124.   Plaintiffs bring this claim individually and on behalf of all other Class members.

125.   Plaintiffs and Defendants have contracted for payment processing services.  As described above, Defendants' actions have violated the specific terms of the form Merchant Service Agreements with their customers.  Defendants are liable for the losses of Plaintiffs and the other Class members that have resulted from Defendants' breaches of the parties' contractual agreements.

126.   The Pricing Schedule in all Assessments Class members' Merchant Applications states either, "Actual interchange passthrough and assessments" or "Card association assessments will be passed through."

127.   Further, the Pricing Schedule in all Class members' Merchant Applications sets forth the rates at which Visa, MasterCard, and Discover access fees will be charged.

128.   As alleged herein, Defendants did not pass actual card association assessments through to Plaintiffs and the other members of the Assessments Class. Instead, Defendants inflated the amounts of card association assessments charged to Plaintiffs and the other members of the Assessments Class.

129.   As alleged herein, Defendants charged Plaintiffs and the other members of the Assessments Class 5 or more basis points in addition to the "actual" card association assessments established by Visa, MasterCard, and Discover.

130.   As alleged herein, Defendants also charged Plaintiffs and the other members of the Assessments Class access fees, *i.e.*, Visa APF, MasterCard NABU, and Discover access fees, in excess of the rates stated in the applicable Merchant Applications.

131.   Defendants' inflation of these assessments breached their contracts with Plaintiffs and the other members of the Assessments Class.

132.   Further, Defendants imposed Junk Fees on Plaintiffs and the other members of the Junk Fee Class.  Junk Fees are flat fees that are not identified as applicable to a particular merchant in its Merchant Application.

133.   Defendants' imposition of Junk Fees constitutes a breach of their contracts with Plaintiffs and the other members of the Junk Fee Class.

134.   Georgia law is applicable to this claim by virtue of the choice of law provision in the form Merchant Agreement.

135.   Under Georgia law, each party to a contract has a duty of good faith and fair dealing.   Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

136.  Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of violations of good faith and fair dealing are evasion of the spirit of the bargain, willful rendering of imperfect performance, and abuse of a power to specify terms.

46

137.   Defendants have breached the covenant of good faith and fair dealing with Plaintiffs and the other Class members through their practices as alleged herein.

138.   Plaintiffs and the other Class members have performed all, or substantially all, of the obligations imposed on them under the Merchant Service Agreement, or those obligations are waived.

139.   Plaintiffs and the other Class members reasonably expected Defendants not to inflate or mark up the card association assessments, including access fees and other assessments, or impose unauthorized Junk Fees, based on the express terms of the contracts as alleged herein.

140.   Plaintiffs and the other Class members sustained damages as a result of Defendants' breaches of contract, as well as the further breaches of the contract as modified by the covenant of good faith and fair dealing.

## COUNT TWO
## Fraudulent Omission

141.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

142.   Plaintiffs bring this claim individually and on behalf of all other Class members.

143.   As alleged herein, Defendants knew but failed to disclose that their pricing models included inflated or marked-up card association assessments, including access fees and other assessments, as well as unauthorized Junk Fees.

144.   Plaintiffs and the other Class members reasonably expected the payment processing services provided to them by Defendants would be based on an interchange-plus, or cost-plus, pricing basis, and that, accordingly, the card association assessments for which they would be charged would include only the actual assessments imposed by the card networks.

145.   Indeed, in the Pricing Schedule portion of each Merchant Application, Defendants expressly promised their merchant clients that, "Card association assessments will be passed through," or that "[a]ctual interchange passthrough and assessments" would be used in pricing.   Defendants expressly identified the Visa, MasterCard, and Discover access fees they would charge merchants in the same document.   Defendants also expressly identified the flat fees they would charge merchants in the same document (in the "Other Fees" portion).

146.   Plaintiffs and the other Class members executed Merchant Applications disclosing the permissible fees Defendants would charge them, and justifiably relied on the terms of that document as alleged herein.

147.   The nature and amount of fees Defendants charged to and collected from Plaintiffs and the other Class members were material to Plaintiffs and the other Class members.

148.   Had Defendants disclosed that they would, in fact, mark up and overcharge for fees and assessments that Defendants promised would be passed through at cost, Plaintiffs and the other members of the Assessments Class would not have obtained payment processing services from Defendants.

149.   Had Defendants disclosed that they would, in fact, impose additional, unauthorized Junk Fees not disclosed in the Pricing Schedule, Plaintiffs and the other members of the Junk Fee Class would not have obtained payment processing services from Defendants.

150.   Furthermore, in each monthly invoice provided to Plaintiffs and the other Class members by Defendants during the Class Period, Defendants failed to disclose that they had imposed inflated or marked-up card association assessments, including access fees and other assessments, on a per-transaction basis.

151.   Similarly, in each monthly invoice provided to Plaintiffs and the other Class members by Defendants during the Class Period, Defendants failed to disclose that they had imposed unauthorized Junk Fees.

152.   Had Plaintiffs and the other Class members been apprised of the true facts – that Defendants had inflated or marked-up the card association assessments and/or imposed unauthorized Junk Fees – they would not have continued obtaining payment card processing services from Defendants.

153.   Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent omissions and failures to disclose the true nature and amounts of the fees they would charge them, and did charge them, during the Class Period.

## COUNT THREE
## Fraudulent Misrepresentation

154.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

155.   Plaintiffs bring this claim individually and on behalf of all other Class members.

156.   As alleged herein, Defendants intentionally misrepresented their pricing model by stating in the Pricing Schedule portion of the Merchant Application that, "Actual interchange passthrough and assessments" would be used in computing prices or that "[c]ard association assessments will be passed through."

157.   Defendants did not charge Plaintiffs and the other members of the Assessments Class in accordance with these representations.  Instead, Defendants inflated or marked-up the actual card association assessments for their own benefit.

158.   As alleged herein, Defendants intentionally misrepresented their pricing model by setting forth in the Pricing Schedule portion of the Merchant Application rates for card association access fees, *i.e.*, Visa APF, MasterCard NABU, and Discover access fees, that they had no intention of honoring.

159.   Defendants did not charge Plaintiffs and the other members of the Assessments Class in accordance with these representations.  Instead, Defendants inflated or marked-up the card association access fees for their own benefit.

160.   As alleged herein, Defendants intentionally misrepresented their pricing model by setting forth in the "Other Fees" portion of the Pricing Schedule in the Merchant Application various flat fees that would be applicable to Plaintiffs and the other members of the Junk Fee Class, which Defendants had no intention of honoring.

161.   Defendants did not charge Plaintiffs and the other members of the Junk Fee Class in accordance with these representations.  Instead, Defendants imposed unauthorized Junk Fees for their own benefit.

162.   Plaintiffs and the other Class members reasonably expected that the payment processing services Defendants provided to them would be based on an interchange-plus, or cost-plus, pricing basis, and that, accordingly, all card association assessments, including access fees and other assessments, would be passed through at cost, and all other flat fees would be disclosed and agreed in advance.

163.   Plaintiffs and the other Class members executed Merchant Applications disclosing the permissible fees Defendants would charge them, and justifiably relied on the terms of that document, as alleged herein.

164.   The nature and amount of fees Defendants charged to Plaintiffs and the other Class members were material to Plaintiffs and the other Class members.

165.   Had Defendants disclosed that they would use a pricing model that would not pass through the assessments, including access fees and other assessments, established by the card networks at cost, and would, in fact, mark up and overcharge for those fees, Plaintiffs and the other members of the Assessments Class would not have obtained payment processing services from Defendants.

166.   Had Defendants disclosed that they would use a pricing model that would not adhere to the authorized list of "Other Fees" contained in the Merchant Application and would, in fact, impose additional, unauthorized Junk Fees,

Plaintiffs and the other members of the Junk Fee Class would not have obtained payment processing services from Defendants.

167.   Furthermore, in each monthly invoice provided to Plaintiffs and the other Class members by Defendants during the Class Period, Defendants misrepresented that they had charged Plaintiffs and the other Class members actual card association assessments, including access fees and other assessments, on a per-transaction basis.   In fact, Defendants added inflation to these assessments, often concealed under misleading labels such as "CHGB."

168.   Similarly, in each monthly invoice provided to Plaintiffs and the other Class members by Defendants during the Class Period, Defendants misrepresented that they had collected only authorized flat fees.  In fact, Defendants also collected unauthorized Junk Fees, often concealed under misleading labels such as "regulatory fee."

169.   Had Plaintiffs and the other Class members been apprised of the true facts – that Defendants had inflated or marked-up the card association assessments and/or imposed unauthorized Junk Fees – they would not have continued obtaining payment card processing services from Defendants.

170.   Plaintiffs and the other Class members were damaged in an amount to be proven at trial as a result of Defendants' fraudulent misrepresentations

concealing the true nature and amounts of the fees they would charge them, and did charge them, during the Class Period.

## COUNT FOUR
## Fraudulent Inducement

171.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

172.   Plaintiffs bring this claim individually and on behalf of all other Class members.

173.   As alleged herein, Defendants concealed their true pricing model by, *inter alia*, stating in the Merchant Application that "[c]ard association assessments will be passed through" or that "[a]ctual interchange passthrough and assessments" would be charged, when in fact they had no intention of honoring this statement; setting forth rates for card association access fees, *i.e.*, Visa APF, MasterCard NABU, and Discover access fees, that they had no intention of honoring; and setting forth, in the "Other Fees" portion of the Pricing Schedule, various flat fees that would be applicable to Plaintiffs and the other members of the Junk Fee Class, which Defendants had no intention of honoring.

174.   Defendants' true pricing model included inflated or marked-up card association assessments, including access fees and other assessments, as well as unauthorized Junk Fees.

175.   Prior to executing Merchant Applications and forming a contract with Defendants, Plaintiffs and the other Class members were deceived by Defendants with respect to the pricing model Defendants would use in processing payments on their behalf.

176.   In particular, Defendants disclosed a Pricing Schedule that did not reflect, omitted, and/or concealed the true pricing model Defendants would use in processing payments.

177.   As alleged herein, Defendants impermissibly and unlawfully inflated or marked-up the card association assessments, including access fees and other assessments, that they charged to Plaintiffs and other members of the Assessments Class, and imposed unauthorized Junk Fees on Plaintiffs and other members of the Junk Fee Class.

178.   As further alleged herein, Defendants knew that their disclosed Pricing Schedule did not accurately reflect the prices and fees they would charge merchants, including Plaintiffs and the other Class members, at the time the Pricing Schedule was published.

179.   The nature and amounts of fees charged by Defendants to Plaintiffs and the other Class members were material to Plaintiffs and the other Class members.   Had Defendants accurately represented that they would inflate

assessments and impose Junk Fees, Plaintiffs and the other Class members would not have contracted with Defendants to receive payment processing services.

180.   Accordingly, Plaintiffs and the other Class members were fraudulently induced to enter into Merchant Service Agreements.

181.   Plaintiffs are entitled to seek damages and/or rescission of their contracts with Defendants, or other equitable relief, including restitution of funds Defendants took from them without permission.

182.    Plaintiffs will make an election of remedies as mandated by Georgia law, if necessary, at the appropriate juncture.

## COUNT FIVE
## Unjust Enrichment and Money Had and Received

183.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

184.   Plaintiffs bring this claim individually and on behalf of all other Class members.

185.   As alleged herein, Defendants were unjustly enriched at the expense of Plaintiffs and the other Class members, who were overcharged by Defendants for card association assessments, including access fees and other assessments, and for unauthorized Junk Fees.

186.   Plaintiffs and the other Class members were unjustly deprived of money obtained by Defendants as a result of their undisclosed, unfair, unscrupulous, and unconscionable inflation of card association assessments and imposition of unauthorized Junk Fees.

187.   It would be inequitable and unconscionable for Defendants to retain the profit, benefit, and other compensation they obtained from Plaintiffs and the other Class members as a result of their wrongful conduct alleged herein.

188.   Plaintiffs and the other Class members are entitled to seek restitution from Defendants as well as an order from this Court requiring disgorgement of all profits, benefits, and other compensation obtained by Defendants by virtue of their wrongful conduct.

189.   This claim is asserted as an alternative to Plaintiffs' claim for breach of contract and in recognition that the form contracts executed by Plaintiffs and other Class members may be void.

### COUNT SIX
### For Declaratory Relief Concerning Enforceability of Exculpatory and/or Unconscionable Contract Terms

190.   Plaintiffs restate and incorporate by reference the allegations in paragraphs 1 through 122, above, as though fully set forth herein.

191.   Plaintiffs bring this claim individually and on behalf of all other Class members.

192.   As alleged herein, Defendants have attempted to immunize themselves from legal claims by imposing improperly exculpatory, adhesive, unfair, and draconian terms in their Merchant Service Agreement making it extremely costly and practically impossible to obtain relief from their improper and unlawful practices.

193.   Such terms include those purporting to:

(a)   give Defendants broad discretion to change the amounts of agreed-upon fees or impose new fees (Ex. 1 at 2-3, 5);

(b)   limit Defendants' liability to one month's worth of overcharges (*id.* at 4);

(c)   limit the statute of limitation for claims related to "billing errors" to 90 days (*id.*);

(d)   require merchants to pay attorneys' fees in any legal action (regardless of whether Defendants are deemed the prevailing parties) (*id.* at 6);

(e)   prohibit merchants from pursuing their claims in a class action (*id.*); and

(f)   prohibit merchants from enforcing their right to a jury trial (*id.*).

194.   These terms are exculpatory and unenforceable under Georgia law.

195.   Under Georgia law, exculpatory clauses are contractual "provisions entirely restricting remedies" or "waiv[ing] substantial rights." *JVC America, Inc.*, 2006 WL 2443735, at *11.

196.   Each of the foregoing clauses is designed to severely restrict or eliminate remedies available to Defendants' merchant clients and to insulate Defendants from liability.

197.   Moreover, the Agreement, as a whole or in part, is substantively and procedurally unconscionable.

198.   Indeed, the Agreement is a contract of adhesion in that it is a standardized form, imposed and drafted by Defendants, which are parties of vastly superior bargaining strength, that only allowed Plaintiffs and the other Class members the opportunity to adhere to them or reject them entirely.

199.   The Agreement is substantively unconscionable to any extent it allowed Defendants to perpetrate the grossly improper acts described herein.

200.   Considering the great business acumen and experience of Defendants in relation to Plaintiffs and the other Class members, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial

unreasonableness of the terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, the Agreement is unconscionable and, therefore, unenforceable as a matter of law.

201.   Certain provisions of the Agreement are also illusory, lacking in mutuality, or lacking in consideration such that they are unenforceable under applicable Georgia law, including any provision purporting to permit any Defendant discretion to change the amounts of agreed-upon fees or impose new fees.

202.   Accordingly, Plaintiffs seek relief declaring these contract terms unenforceable, and injunctive relief preventing their enforcement.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other Class members, respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1.     Certifying the proposed Assessments Class and Junk Fee Class, including appointment of Plaintiffs as Class Representatives and their counsel as Class Counsel;

2.      Temporarily and permanently enjoining Defendants from continuing their unlawful, unfair, deceptive, misleading, and fraudulent business practices alleged in this complaint;

3.      Providing further injunctive relief, including restitution of any sums obtained by Defendants from Plaintiffs and the other Class members as a result of their unlawful, unfair, deceptive, misleading, and fraudulent business practices, and disgorgement of profits;

4.      Declaring the several challenged provisions of the Merchant Service Agreement to be unenforceable and enjoining their enforcement;

5.      Awarding all appropriate damages, including pre- and post-judgment interest at the maximum rate permitted by applicable law;

6.      Granting a trial by jury; and

7.      Providing such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all claims so triable.

**DATED** this 22nd day of February, 2017.

Respectfully submitted,

BY:   **DOFFERMYRE, SHIELDS, CANFIELD & KNOWLES LLC**

<u>/s/ Ken Canfield</u>
Ken Canfield (Ga. Bar 107744)
1355 Peachtree Street, N.E.
Suite 1600
Atlanta, Georgia  30309
Tel: (404) 881-8900
kcanfield@dsckd.com

**GRANT & EISENHOFER P.A.**
Adam J. Levitt (*pro hac vice*)
30 North LaSalle Street, Suite 2350
Chicago, Illinois  60602
Tel: (312) 214-0000
alevitt@gelaw.com

**GRANT & EISENHOFER P.A.**
Kyle J. McGee (*pro hac vice*)
123 Justison Street
Wilmington, Delaware  19801
Tel: (302) 622-7000
kmcgee@gelaw.com

**WEBB, KLASE & LEMOND LLC**
E. Adam Webb (Ga. Bar 743910)
Matthew C. Klase (Ga. Bar 141903)
1900 The Exchange, S.E.
Suite 480

Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com
Matt@WebbLLC.com

**THE DICELLO LAW FIRM**
Mark DiCello (*pro hac vice*)
7556 Mentor Avenue
Mentor, Ohio  44060
Tel: (440) 953-8888
madicello@dicellolaw.com

**STEVEN M. GOLDBERG CO., LPA**
Steven M. Goldberg (*pro hac vice*)
31300 Solon Road, Suite 12
Solon, Ohio  44139
Tel: (440) 519-9900
steven@smglegal.com

*Counsel for Plaintiffs and the Proposed Class*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 22nd day of February, 2017, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system which automatically sends email notification of such filing to all attorneys of record.

<u>*/s/ Kenneth S. Canfield*</u>
Kenneth S. Canfield